## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIE GOODING,** | : | |
| | : | **Civil Action No. 1:CV-07-1243** |
| **Petitioner** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | **(Magistrate Judge Blewitt)** |
| **JAMES WYNDER et al.,** | : | |
| | : | |
| **Respondents** | : | |

## MEMORANDUM

Before the Court is Petitioner Willie Gooding's petition for a writ of habeas corpus (Doc. No. 1) pursuant to 28 U.S.C. § 2254, Magistrate Judge Thomas M. Blewitt's Report and Recommendation ("R&R") recommending that the petition be denied (Doc. No. 22), and Petitioner's objections to the R&R (Doc. No. 23). For the reasons that follow, the Court will adopt the R&R with the additional considerations discussed below and deny the petition.

## I.   BACKGROUND

### A.  Factual Background

The relevant factual background of this case, as taken from the record and summary of the Pennsylvania Superior Court, is as follows. On November 7, 1996, Terrence Murphy was attempting to rob the house of Crystal Brown, where he knew Petitioner and others engaged in drug trafficking. Murphy was discovered, and in the course of fleeing he fired shots at an individual named Charles Malloy, one of Petitioner's associates. Petitioner, Malloy, Antoine Brown, and Cory Riera set out to locate Murphy, whom they believed to be the shooter because of his reputation for robbing drug dealers. They found Arthur Irick, an associate of Murphy, who led them to the Starlight apartment building where he believed Murphy could be found. After a search of the building did not turn up Murphy, Malloy struck Irick with a gun and

dragged him back into their car. The group then drove to a deserted lot where Malloy dragged

Irick from the vehicle and shot him in the head four times, killing him. As the group departed

the scene, Petitioner told Malloy and the others to "keep this between us." The murder weapon

was then dropped in a sewer outside Riera's home.

### B. Procedural Background

In the interest of economy, the Court incorporates the uncontested procedural background

of the case as presented in the R&R. (Doc. No. 22 at 2-6.) The necessary background for

purposes of this memorandum is set out as follows in Judge Blewitt's R&R:

> On September 10, 2001, the trial for the murder of Arthur Irick
> commenced in York County, Pennsylvania, in which the Petitioner
> was a co-defendant, and was represented by Royce Morris, Esquire.
> (Doc. 2, p. 2). At the conclusion of the trial . . . the Petitioner was
> found guilty of murder in the third degree and kidnaping, and he was
> acquitted of all other charges including first degree murder and
> conspiracy. (Doc. 2, p. 3 and Doc. 14, p. 3). On October 24, 2001,
> Petitioner was sentenced to the maximum 20-40 years imprisonment
> for third degree murder as well as the maximum 10-20 years
> imprisonment for kidnaping, resulting in a total sentence of 30-60
> years imprisonment. (Id.). Petitioner's timely post-sentence motions
> were denied on November 19, 2001, and on February 25, 2003, the
> Superior Court affirmed the Petitioner's judgment of sentence. (Id.;
> See also Commonwealth v. Gooding, 835 A.2d 709 (Pa. Super.
> 2003)). The Pennsylvania Supreme Court denied the Petitioner's
> petition for allowance of appeal on November 13, 2003. (Id.; See also
> Commonwealth v. Gooding, 835 A.2d 709 (Pa. 2003)). For all the
> direct appeals, Mr. Morris was the Petitioner's counsel. (Id.).
> Petitioner did not file a petition for writ of certiorari with the United
> States Supreme Court. Thus, as Petitioner recognizes (Doc. 2, p. 7),
> his judgment of sentence became final on or about February 13, 2004.
>
> On June 10, 2004, Petitioner filed a pro se Petition under the
> Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. § 9541, et seq.
> Petitioner claimed that his trial counsel and appellate counsel were
> ineffective despite the fact that Petitioner was represented by the
> same counsel at his trial, sentencing and during his direct appeal.
> (Doc. 19, 12-1-06 Superior Court Memorandum, p. 2). Subsequently,
> counsel was appointed to represent Petitioner, and on June 25, 2004,

David McGlaughlin, Esq., filed a PCRA Petition on Petitioner's behalf. On July 25, 2004, counsel filed a supplemental PCRA Petition for Petitioner.

On August 9, 2004, the PCRA Court held an evidentiary hearing. (Doc. 2, p. 4 and Doc. 14, p. 3). Petitioner was represented by counsel during the hearing. (Id.). One of the bases for Petitioner's PCRA Petition was that direct appeal counsel (i.e. Attorney Morris) was ineffective for failing to preserve the claim challenging the admission of "other crimes" evidence during Petitioner's trial. (Id.). Petitioner states that despite the testimony of Mr. Morris at the PCRA hearing that he did not "comply with the 'technical rule' requiring him to adequately cite to the record," his PCRA Petition was denied on February 28, 2005. (Id.). Petitioner then appealed, pro se, the denial of his PCRA Petition to the Pennsylvania Superior Court, and as the Superior Court stated, he raised the following five issues for review:

A. Whether the Appellant [Petitioner] was denied due process under the United States Constitution and his right to a fair trial by trial court removal of a sitting juror and further prejudiced by trial counsel's failure to raise an objection or seek rehabilitation of the juror.

B. Whether the Appellant was denied due process of law under the United States Constitution based upon trial counsel's failure to object when the trial court gave an improper and erroneous instruction on accomplice liability when Appellant was only charged in the bill of information as a conspirator, not an accomplice.

C. Whether direct appeal counsel was ineffective for failing to properly preserve for appellant review the Appellant's challenge to the admission of uncharged crimes evidence in violation of Rule 404(b) which violated his due process of law under the United States Constitution.

D. Whether PCRA counsel was ineffective for omitting a meritorious issue (the infraction: trial counsel's ineffectiveness for not objecting to trial court error when giving instructions to the jury on the applicable penalties for first and third degree murder), from the original Post Conviction Relief Act (PCRA) [petition] filed pro se.

E. Whether [the] trial court abused its discretion by imposing a sentence far in excess to [sic] the Pennsylvania sentencing guidelines by enhancing Appellant's guideline range to twice what was called for in [] 204 Pa. Crimes Code in the aggravated range, thus violating

Appellant's state and federal rights to due process. (Footnote omitted).

(Doc. 19, 12-1-06 Superior Court Memorandum, pp. 3-4). With respect to Petitioner's fifth issue, Claim E., the Superior Court noted that since this issue was "previously raised and disposed of on direct appeal," "this claim may not be considered under the PCRA." (Doc. 19, 12-1-06 Superior Court Memorandum, p. 4, n. 4). (citations omitted). The denial of Petitioner's PCRA Petition was affirmed by the Superior Court on December 1, 2006. (Id., p. 16). Petitioner did not pursue further review with respect to the denial of his PCRA Petition by filing a Petition for Allowance of Appeal with the Pennsylvania Supreme Court. (Doc. 14, p. 3). Petitioner then filed this instant Habeas Petition on July 10, 2007, under 28 U.S.C. § 2254.

**B. Standard of Review**

The Magistrate Act, 28 U.S.C. § 636, and Fed. R. Civ. P. 72(b), provide that any party may file written objections to a magistrate's proposed findings and recommendations. In deciding whether to accept, reject or modify the R&R, the Court is to make a de novo determination of those portions of the R&R to which objection is made. 28 U.S.C. § 636(b)(1). Petitioner raises three objections to the R&R: (1) the R&R failed to address the claim that introduction of "other crimes" evidence violated Petitioner's right to due process under the Fourteenth Amendment; (2) the R&R did not specifically address 23 examples listed in Petitioner's brief that purportedly show prejudicial references in his trial; and (3) the R&R did not address Petitioner's claim that the trial court erred in failing to give, and counsel was ineffective for failing to request, a cautionary instruction on the limited use of other crimes and bad acts evidence. (Doc. No. 23.)

28 U.S.C. § 2254 provides that a person in custody pursuant to the judgment of a state court may apply for a writ of habeas corpus if the custody was imposed in violation of the

Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). Under the

Antiterrorism and Effective Death Penalty Act ("AEDPA"), "[a]n application for a writ of

habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not

be granted unless it appears that . . . the applicant has exhausted the remedies available in the

courts of the State." 28 U.S.C. § 2254(b)(1)(A). To exhaust state court remedies, the petitioner

must "fairly present" all federal claims to the highest state court before bringing them in federal

court.[1] Stevens v. Delaware Correctional Center, 295 F.3d 361, 369 (3d Cir. 2002) (citing

Whitney v. Horn, 280 F.3d 240, 250 (3d Cir. 2002)). The exhaustion requirement may be

excused, however, "if requiring exhaustion would be futile, i.e., exhaustion is impossible due to

procedural default and state law clearly forecloses review of the unexhausted claim." Werts v.

Vaughn, 228 F.3d 178, 192 (3d Cir. 2000) (citing Lambert v. Blackwell, 134 F.3d 506, 513 (3d

Cir. 1997)). If such a state procedural default has occurred, the court still may not consider the

merits of the claims unless the petitioner establishes cause for the procedural default and

prejudice or a fundamental miscarriage of justice. Lines v. Larkins, 208 F.3d 153, 160 (3d Cir.

2000).

If a habeas petitioner's claim was "adjudicated on the merits" in state court, "the petition

may not be granted unless the state court decision 'was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States' or 'was based on an unreasonable determination of the facts in light of the

---

[1] Pennsylvania Supreme Court Order No. 218 removes review of criminal and collateral appeals in the Pennsylvania Supreme Court from normal and established appellate review procedure in Pennsylvania. Lambert v. Blackwell, 387 F.3d 210, 233 (3d Cir. 2004). As such, petitioners are not required to seek review from the Pennsylvania Supreme Court in order to give the Pennsylvania courts a "full opportunity to resolve any constitutional claims." Id.

evidence presented in the State court proceeding." Simmons v. Beard, 581 F.3d 158, 165 (3d

Cir. 2009) (citing U.S.C. § 2254(d)). A decision is contrary to Supreme Court precedent "if the

state court reached a conclusion opposite to that reached by the Supreme Court on a question of

law or if the state court decides a case differently than the Supreme Court has on a set of

materially indistinguishable facts." Fahy v. Horn, 516 F.3d 169, 189 n.20 (3d Cir. 2008)

(quoting Shelton v. Carroll, 464 F.3d 423, 436-37 (3d Cir. 2006)). An unreasonable application

of clearly established law occurs where the state court: "(1) unreasonably applies the correct

Supreme Court precedent to the facts of a case; or (2) unreasonably extends or refuses to extend

that precedent to a new context where it should (or should not) apply." Id.

When the state court decision was not made on the merits, the limitations of § 2254(d) do

not apply; the federal habeas court instead applies a pre-AEDPA de novo review of legal

questions and mixed questions of law and fact. Simmons, 581 F.3d at 165. In either scenario,

state court factual determinations are presumed correct, with the burden on petitioner to rebut

those findings by clear and convincing evidence. Id. (citing 28 U.S.C. § 2254(e)(1)).

## II.     DISCUSSION

Petitioner's first claim for habeas relief raises violations of his 6th and 14th Amendment

rights:

> Trial court allowed prosecution to smear me as a drug dealer in a
> case that did not involve drugs. Prosecutor exploited judge's
> ruling to depict me as a bad man generally who was ruining the
> local community. Direct appeal counsel failed to adequately
> preserve this claim. Trial court also failed to issue cautionary
> instructions. Petitioner is alleging both a due process and right to
> counsel violation.

(Doc. No. 1 at 6.) Petitioner's second claim for relief also asserts the 6th Amendment and

ineffective assistance of his counsel in failing to object to the removal of a juror at his trial for note-taking.  (Id. at 7.)

Petitioner's objections to the R&R solely concern issues surrounding his first claim for relief.  (Doc. No. 23.)  Respondents have not objected to the R&R.  There is no objection to Judge Blewitt's determinations with regard to exhaustion (Doc. No. 22 at 10-11), procedural default (Id. at 11-12), ineffective assistance for failure to adequately preserve Petitioner's "other crimes" prejudice claim on direct appeal[2] (Id. at 22-23), and ineffective assistance for failing to object to the removal of a juror at trial (Id. at 23-33).

Petitioner's objections require the Court to assess three related claims: (1) that the introduction "other crimes and bad acts" evidence throughout the proceeding rendered the trial fundamentally unfair due to its prejudicial effect; (2) that prosecutorial misconduct throughout the proceeding infected the trial with unfairness and made the resulting conviction a denial of due process; and (3) that counsel was ineffective for failing to request a limiting instruction for this other crimes evidence.[3]  (Doc. No. 23.)  In support of these contentions, Petitioner points to 23 instances during the proceedings that prejudicial evidence was admitted or inappropriately referenced by the prosecutor, including during voir dire, opening, evidence presentation, and closing arguments.  (Doc. No. 2 at 14-18.)   The Court will evaluate these claims separately.

### A.  Introduction of Other Crimes Evidence

_____

[2]  To the extent Petitioner does intend to object to Judge Blewitt's determination on this ineffective assistance claim, that objection is overruled for the reasons discussed below in connection with this Court's review of Petitioner's underlying due process claim for the trial court's admission of "other crimes" evidence.

[3]  Petitioner also raises a related due process violation resulting from the trial court's failure to *sua sponte* provide an appropriate limiting instruction on the forbidden criminal propensity inference.  The Court will address this contention in connection with Petitioner's ineffective assistance claim on the same issue.

Petitioner was on trial for the kidnaping and murder of Arthur Irick.  Despite there not being any charges against him relating to drug activity, the prosecution sought to introduce evidence of Petitioner's involvement in drug trafficking and his history with the alleged co-conspirators in that enterprise.  The trial court denied Petitioner's motion in limine to preclude this evidence, stating, as set out in petitioner's memorandum:

> Accordingly, we will at this point deny the motion in limine to [exclude] evidence of the drug trafficking since we deem it to be an integral part of the case.  It does show the relationship between the Defendant and other people who he allegedly conspired with and committed some of these crimes with.  And based on those factors, we think that it would be relevant, and we are not satisfied that the probative value would out weigh (sic) the prejudicial effect so we will permit the testimony at this point.

(Doc. No. 2 at 19-20.)  This ruling was never reviewed on Petitioner's direct appeal as the appellate court found the issue waived due to counsel's failure to cite to the record properly as required by Pa.R.A.P. 2119(a).  See Com. v. Gooding, 818 A.2d 546, 552 (Pa. Super. Ct. 2003).  After his appeal was denied, Petitioner filed a PCRA petition raising as one ground ineffective assistance of counsel in failing to properly preserve this claim on his direct appeal.  The trial court denied the petition, and the Pennsylvania Superior Court affirmed that decision, finding that counsel could not be ineffective for failing to preserve this claim because "the underlying Rule 404(b) issue is without merit."  (Doc. No. 19-2 at 14.)  In coming to this conclusion, the court relied on the Pennsylvania Supreme Court's determination of the same Rule 404(b) challenge raised by Petitioner's co-defendant, Charles Malloy:

> Neither the single reference to appellant's drug activity, nor evidence of the drug activity of others, was introduced to prove criminal propensity. Instead, the evidence was admitted in order to demonstrate the motive for the murder of Arthur Irick. Appellant argues that this murder was not drug-related, but rather, that he killed

the victim because he believed that the victim had attempted to rob him and shoot him earlier in the evening. While there was evidence of the retaliation motive appellant cites, this was not the entire story. The Commonwealth's evidence demonstrated that the victim and his associates were "stick-up kids" who systematically robbed known drug dealers; that appellant and his co-conspirators knew this fact; that appellant and his co-conspirators were drug dealers; that the victim attempted to rob appellant earlier in the evening precisely because appellant and his co-conspirators were drug dealers; and that appellant murdered the victim in retaliation. Thus, the evidence of the drug-related activity, which was limited as to appellant's specific prior bad acts, was properly admitted to show that this killing did not occur in a vacuum, i.e. to demonstrate motive. See, e.g., Commonwealth v. Hall, 523 Pa. 75, 565 A.2d 144, 149 (1989) (evidence of past drug dealings admissible to demonstrate motive for murder). Moreover, given the limited nature of the references, and the fact that the evidence was not exploited for improper purposes, we conclude that the trial court did not abuse its discretion in determining that the probative value of the evidence outweighed any prospect of prejudice.

Com v. Malloy, 856 A.2d 767, 776 (Pa. 2004). The superior court found that this reasoning applied equally to Petitioner's objection because "the facts, actors, and issues in Malloy's case are identical to those in the case *sub judice*." (Doc. No. 19-2 at 14.)

Judge Blewitt determined that this claim had been fairly presented to the Pennsylvania Superior Court as part of Petitioner's PCRA petition and reviewed on the merits, justifying deferential review under § 2254(d). (Doc. No. 22 at 20.) Petitioner objects to this determination, arguing that while his 6th Amendment ineffective assistance claim was reviewed on the merits, the underlying 14th Amendment claim never was reviewed and no AEDPA deference is due. (Doc. No. 23 at 2-3.)

A claim has been "adjudicated on the merits" under § 2254(d) when a state court decision: "1) finally resolves the claim, and 2) resolves the claim on the basis of its substance, rather than on a procedural, or other, ground." Thomas v. Horn, 570 F.3d 105, 115 (3d Cir.

2009) (citing Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004).  This adjudication can occur at any level of the state court system, as long as the decision finally resolves the claim, meaning "that the state court's resolution of the claim must have preclusive effect."  Id.  It is clear that the Pennsylvania Superior Court reviewed Petitioner's underlying prejudicial "other crimes" evidence claim and found that it "is without merit."  (Doc. No. 19-2 at 14.)  AEDPA deference is properly applied to the state court's resolution of the claim in this context.  See Albrecht v. Horn, 485 F.3d 103, 117 (3d Cir. 2007) ("The state Supreme Court did not, of course, address the *Mills* issue on the merits in the ordinary sense; instead, it examined the merits in the context of the prejudice prong of an ineffective assistance of post-conviction counsel claim.  Albrecht does not argue that this issue may be reviewed *de novo* under these circumstances, nor would such an argument have merit.").

Habeas relief is not available to a prisoner for violation of a right created by state law unless there is a federal constitutional violation.  See e.g., Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983).  However, admission of evidence that is relevant but excessively inflammatory can create a cognizable constitutional violation if it violates a defendant's right to a fair trial.  See Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1982);  Lesko v. Owens, 881 F.2d 44, 51 (3d Cir. 1989).  Despite this, not every error by a state court in balancing the relative probative value and prejudicial effect of evidence rises to constitutional dimensions.  Id.  Accordingly, "[a]dmission of 'other crimes' evidence provides a ground for federal habeas relief only if 'the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial."  Bronshtein v. Horn, 404 F.3d 700, 730-31 (3d Cir. 2005) (citing Lesko, 881 F.2d at 52).

Here, as described in detail above, the Pennsylvania Superior Court applied rules consistent with these prevailing due process principles established by the United States Supreme Court and engaged in a proper inquiry by balancing the probative value of the evidence against its prejudicial impact. Considering the record, the court's determination was also not an unreasonable application of the Supreme Court precedent. For his conduct, the Commonwealth charged Petitioner with, *inter alia*, first and third degree murder (as an accomplice) and with conspiracy. (Doc. No. 2 at 2.) These charges put Petitioner's state of mind directly at issue. The distinction between first and third degree murder in Pennsylvania is based on intent. See 18 Pa. Con. Stat. Ann. § 2502. First degree murder is an "intentional killing," which is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." Id. For Petitioner to be responsible as an accomplice to this act, the Commonwealth also had to prove that Petitioner aided, agreed to aid, or attempted to aid Malloy in planning or committing the murder with the intent of promoting or facilitating the commission of the offense. See 18 Pa. Con. Stat. Ann. § 306. Given these charges, evidence of Petitioner's motive and state of mind was a key element of the prosecution's case. See Lesko, 881 F.2d at 53 ("[O]ne means of proving Lesko's intent to promote or facilitate Travaglia's act of murder, is to establish that Lesko, like Travaglia, had a motive to kill. In sum, proof of Lesko's state of mind, and consequently, any motive he might have had to kill Officer Miller, were genuinely at issue in the case.").

Testimony showed that Petitioner, Malloy, Antoine Brown, and Cory Riera had all known each other from the streets in Brooklyn, New York, before moving and selling drugs in York, Pennsylvania. (Trial Tr. 500-503.) Terrance Murphy testified that he was known around

11

the community as a "stick-up kid," who targeted and robbed drug dealers because they had large amounts of drugs and cash on them most of the time.  (Trial Tr. 333-37, 340-41.)  On the night of the shooting, Murphy and two others were targeting Crystal Brown's house, which Malloy and Petitioner used as a location to sell drugs.  (Id. at 349.)  At some point, Murphy fired shots at Malloy and fled the scene.  (Id. at 333-34, 349-50.)  Shortly after this incident, Murphy ran into the eventual victim and fellow stick-up kid Arthur Irick, who he had known for some time, and informed him where he was staying.  (Id. at 328, 335-36.)  While no one at Crystal Brown's house could identify Murphy as the shooter, after speaking with each other and other witnesses, Petitioner and the others believed that Murphy and Irick had been seen together and were possibly involved in the shooting because of their reputation as stick up kids.  (Id. 438-41, 507.)  Afterwards, they set out to find Irick to question him about the incident.  (Id. at 441.)

As every court to have reviewed the issue has determined, this evidence showing Petitioner's involvement in drug trafficking, specifically with the other individuals involved in Irick's murder, was highly probative to show the motive for the murder.  It is also probative to explain the circumstances surrounding the incident, particularly why Irick and Murphy were targeted by the group even though their identities could not be ascertained.  The evidence that these men had met and known each other in Brooklyn before coming to York, Pennsylvania shows their ongoing relationship, which is probative on elements of the conspiracy charge.  The Court recognizes that, like any prior bad acts evidence, there is a risk of prejudice to the Defendant—the Court notes that the challenged evidence also clearly showed that the victim of the crime was involved in drug trafficking and robbery—from introduction of this evidence. Despite this, the evidence of Petitioner's drug trafficking is not so inflammatory that the jury

12

would be tempted to base its verdict on emotion.  The evidence also does not present problems

of distraction or confusion to an extent they substantially outweigh the probative value.

Considering the above, the record clearly supports the state court's determination and the Court

agrees that Petitioner was not denied a fair trial.  As such, the Court will deny Petitioner's claim

for relief based on introduction of this "other crimes" evidence.

### B.  Prosecutorial Misconduct

Though presented together with his "other crimes" evidence claim addressed directly

above, Petitioner also argues and cites to cases for the proposition that the prosecutor's conduct

during the trial denied him due process because it infected the trial with unfairness.  (Doc. No. 2

at 22.)  Petitioner particularly challenges the prosecutor's theme that the men involved in the

murder of Arthur Irick all came from New York City to York, Pennsylvania in order to sell

drugs.  (Id.)  For instance, in his opening statement, the prosecutor highlighted the proposed

connection between drug dealing and the eventual murder of Arthur Irick:

> [D]uring the course of this trial, you're going to hear evidence of
> drug dealing, you're going to hear evidence of violence and you're
> going to hear evidence of revenge.  Perhaps, all of the makings of a
> Hollywood movie.  On November 8th of '96, it would be those three
> things that would combing that would lead to Arthur Irick's death. .
> . . So let's look at the first fateful element, drug dealing.  1996, York
> City was perhaps no different than it is today, infiltrated by New
> York drug dealers coming down here to the city, bringing with them
> large quantities of crack cocaine, finding a place to stay within that
> – finding a place to deal. . . . All of these individuals, ladies and
> gentlemen, from New York, came to York City, drug dealers, really.
> With that, they brought violence.

(Trial Tr. at 145-146.)  The prosecutor continued to tie Petitioner's drug connection into the

murder in his closing, suggesting that Petitioner was running a drug house and his motive for

aiding in the death of Irick was to maintain his reputation in the street by retaliating for the

attempted robbery by Murphy.  In referring to his own witnesses (though the comments would also clearly reflect on Petitioner), who defense counsel had painted as non-credible, the prosecutor stated:

> Now, Mr. Morris rightfully so has made an argument that P.B., Twon, T-Top, Selena, Parker are all people that should be disbelieved or, at least, aren't good people.  Now, I don't think that, as you sit here and listened to the testimony, that you think that – I believe that they are.  It was like pulling teeth.  These are not nice people.  These aren't good people.  Good people don't get involved in this kind of crap. . . . They're not nice people.  What do you expect in a case like this, to be sitting on that witness stand, teachers, preachers, YMCA workers, housewives, insurance salesmen, they don't get involved in this kind of underworld and nefarious drug dealing, killing activity.  This is the kind of crap that is in your city, and this death is as a result of that kind of crap. . . . I didn't paint them as anything other than what they were . . . That doesn't mean that they lied to you.

(Id. at 597-98.)  Petitioner argues that similar comments were made during voir dire and in the case-in-chief, some of which were discussed above, and that "[t]he intent and effect of these exhortations were to convict in order to address the rampant crime problems of York, PA and to depict petitioner generally as a bad and dangerous man."  (Doc. No. 2 at 22.)

Though prosecutorial misconduct does not appear to be included as one of the five grounds for review in the Pennsylvania Superior Court's memorandum resolving Petitioner's PCRA appeal, (See Doc. No. 19-2 at 3-4), the court nevertheless found in a footnote that the prosecutor's opening and closing statements were not impermissibly prejudicial for the references to drug dealing as the comments were supported by evidence which was properly introduced to show Petitioner's involvement in drug trafficking (Id. 19-2 at 14 n.13).  In making this determination, the court relied on Pennsylvania Supreme Court precedent for the proposition that "a prosecutor is permitted to vigorously argue his case as long as his comments are

supported by evidence and contain inferences which are reasonably derived from that evidence."
(Id.)  Given the uncertainty of the record on this claim, it is not clear whether the Pennsylvania
Superior Court's determination is entitled to deference.  Respondents, perhaps not recognizing
the makings of any prosecutorial misconduct claim in Petitioner's petition and brief due to its
presentation along with the "other crimes" claim, have not addressed it in their response.  There
is no need to decide whether the court's decision is entitled to deference on this issue, however,
as the Court finds, even reviewing de novo, that the Pennsylvania court correctly decided the
issue.  See e.g., Albrecht v. Horn, 485 F.3d 103, 129 n.11 (3d Cir. 2007).

Prosecutorial misconduct "may 'so infect the trial with unfairness as to make the
resulting conviction a denial of due process.'"  Moore v. Morton, 255 F.3d 95, 106 (3d Cir.
2001) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  "[I]t 'is not enough that
the prosecutors' remarks were undesirable or even universally condemned," Darden v.
Wainwright, 477 U.S. 168, 181 (1986), for a due process violation to occur, the prosecutor's
conduct must amount to a "failure to observe that fundamental fairness essential the very concept
of justice."  Moore, 255 F.3d at 106.  In conducting this review, the Court must "examine the
prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of
the conduct, the effect of the curative instructions, and the quantum of evidence against the
defendant" and distinguish between ordinary trial error and egregious misconduct.  Id. at 107;
Fahy v. Horn, 516 F.3d 169, 198-99 (3d Cir. 2008).   Though not altering the test, the Supreme
Court has taken special care to assure that prosecutorial misconduct in no way impermissibly
infringes specific guarantees of the Bill of Rights such as the right to counsel or the right against
self-incrimination.  Id. (citing Darden, 477 U.S. at 182.)

Considering the prosecutor's conduct, the Court does not find any impropriety in the prosecutor's remarks regarding Petitioner's connection to drug trafficking activities with the other individuals involved in Irick's murder or their previous relationship in New York City. As explained in detail above, this evidence was particularly probative on Petitioner's state of mind, motive for the murder, and on the relationship between the alleged co-conspirators. The Court also does not agree with Petitioner's assertion that the prosecutor wildly exploited the trial court's ruling allowing this evidence. Specifically reviewing Petitioner's 23 highlighted instances of prejudicial references, most go precisely to the proper issues for which the drug trafficking was admitted. Additionally, considering the trial court's decision to admit this evidence, there does not appear to be anything improper about the prosecutor (and defense attorney) asking the prospective jurors at voir dire whether the presence of drugs in the case would make it impossible for them to be fair and impartial to either the prosecution or defense. (See Trial Tr. at 109-10, 136-137.)

There is no question, however, that at certain points the prosecutor used legitimate evidence to argue for improper and irrelevant inferences. This is most clear in the prosecutor's references to the broader social problems at the time in York, Pennsylvania, suggesting that violent drug dealers from New York City had "infiltrated" York, Pennsylvania and remarking that "this is the kind of crap in your city." In reviewing very similar comments made in the separate trial of Petitioner's co-defendant Malloy—the prosecution in Malloy's trial stated in opening that York County had been subject to an "onslaught" of drug dealers and violence from New York—the Pennsylvania Supreme Court stated:

> In this case, the drug motive was certainly relevant and the fact that
> appellant and his cohorts were from New York was, if not strictly

> relevant, not inherently prejudicial, either. To the extent that the
> prosecutor then generalized from the facts here to speak in his
> opening of an "onslaught," however, there was certainly a basis for
> trial counsel to forward an objection. Whether an "onslaught" existed
> was not remotely at issue; nor was it relevant to attempt to tie
> appellant's alleged conduct into some broader social problem
> involving outsiders coming into the county. In addition, this Court is
> not naive as to the xenophobic appeal the prosecutor was making in
> choosing to argue this irrelevancy.

Malloy, 856 A.2d at 783. The Court has the same concerns about the prosecutor's similar

remarks in the case *sub judice*. Indeed, such remarks that tend to divert the jury from its duty to

decide the guilt or innocence of the accused are improper fodder for a prosecutor. See American

Bar Association, Standards for Criminal Justice: Prosecution and Defense Function § 3-5.8(d);

see also United States v. Miles, 53 F. App'x 622, 630-31 (3d Cir. 2002) ("In his rebuttal

argument, the prosecutor indicated that 'our purpose' was not to obtain a conviction but to 'get

justice' and that 'we're here to keep this stuff off the street. . . .' The prosecutor thereby in

addition to expressing his own personal view, diverted the jury's attention to the broader aim of

suppressing the drug trade and away from its obligation to decide the case on the evidence

presented."). Despite this, upon careful review of the entire proceedings and considering the

particular highlighted items in the Petitioner's brief, it is clear that the prosecutor did not belabor

these irrelevant assertions but largely argued the proper connection between Petitioner's drug

activities and the murder of Arthur Irick. Additionally, though not targeted at any specific

remark by the prosecutor, the trial judge did instruct the jury both before the opening and

summation that the statements and arguments of counsel were not evidence. (Trial Tr. at 143,

579.)

   Lastly, the evidence against petitioner was significant if not overwhelming. The key

evidence against Petitioner was the testimony of Antoine Brown and Cory Riera, who were both admittedly present and involved in Irick's murder.  They both gave testimony about the events of the evening that implicated Petitioner as an accomplice in the murder.  The testimony showed that, after the events discussed above in which Terrence Murphy had attempted to rob Crystal Brown's house where Petitioner was living, Malloy, Brown, Riera and Petitioner went looking for Arthur Irick to find out information about the shooting and attempted robbery.  (Trial Tr. at 441, 507-08.)  They drove in separate cars, Petitioner driving the lead car with Riera as a passenger and Brown with Malloy as a passenger.  (Id. at 441-42, 510-11.)  They spotted Irick at the Hess Gas Station in the phone booth, where both cars pulled over.  (Id. at 445, 511.)   Malloy and Irick spoke and then both got into Brown's car.  (Id. at 446, 512.)  At that point, the two cars went to Riera's apartment so he could pick up his gun, which he gave to Malloy.  (Id. at 447-50, 512-13.)  The group then drove to the Starlight apartment building, where Irick thought they could find Murphy.  (Id. at 450-51, 515.)  At the Starlight, Irick and Malloy got out of Brown's car and went up to the building, but no one answered the intercom.  (Id.)  Malloy and Irick began to walk back to the cars when Malloy took out the gun and struck Irick in the head with it.  (Id. at 451, 517.)  Malloy then forced Irick back into Brown's car and looked to Petitioner while making a shooting gesture at the back of Irick's head; Petitioner waived him off and told the other car to follow him.  (Id. at 467, 517-18.)  Petitioner led them to a vacant lot where both cars stopped and Malloy ordered Irick out of Brown's car with the gun in his hand.  (Id. at 460, 521.)  Irick was crying and begging not to get out of the car, but Riera told him he just had to walk back on his own.  (Id. at 462, 523.)  When Irick eventually agreed to get out of the car, Malloy grabbed him, took him to the front of the car, and shot him several times.  (Id. at 462, 523-24.)

After the shots were fired, Brown fled the scene alone in his car and Malloy jumped in the car Petitioner was driving.  (Id. at 463-64, 524.)  Petitioner then drove Malloy and Riera from the scene; they discussed where to dump the murder weapon and the Petitioner told them not to tell anyone else about the killing.  (Id. at 525, 552.)  When the three got to Riera's apartment, Malloy got out and dumped the gun into the sewer in front of the apartment.  (Id.)

While these witnesses are clearly subject to and were attacked for lack of credibility, their testimony was largely consistent about the overall series of events that led to Irick's murder.  Significant aspects of Brown and Riera's testimony were also corroborated by testimonial evidence from other prosecution witnesses such as Terrence Murphy (see e.g., Id. at 335, 348-49), and also physical evidence such as the murder weapon investigators found two years later with Riera's cooperation that matched the casings found at the scene (Id. at 296).  Additionally, as discussed above, the evidence also showed a strong motive for the group's efforts in tracking down Irick and eventually killing him.  Given all this, the Court finds that the evidence against Petitioner was significant and strongly supported the conviction for third-degree murder and kidnaping as an accomplice.  See Moore, 255 F.3d at 119.

Considering the above, the Court finds that the conduct of the prosecutor did not infect the trial with unfairness such that the conviction was a denial of due process.  Though some improper remarks were made by the prosecutor in his opening and closing, their effect in the overall proceedings were limited.  This determination is supported by the instructions given by the trial judge informing the jury that counsel's arguments were not evidence and also the significant evidence presented against Petitioner.  As such, the record strongly supports the Pennsylvania Superior Court's determination that the prosecutor's remarks were not overly

prejudicial, and the Court will deny Petitioner's claim for relief based on prosecutorial misconduct.

### C.  Jury Instructions

Petitioner's last objection is based on the lack of a limiting instruction given to the jury regarding the other crimes evidence discussed above.  Petitioner argues that his counsel's failure to request a limiting instruction was ineffective assistance of counsel and that the trial court's failure to *sua sponte* give this instruction was a violation of his due process rights.

The Court first notes that it is not clear from the record whether this claim was ever fairly presented to the Pennsylvania courts.  Though somewhat related to Petitioner's other claims, the lack of a cautionary instruction is never discussed in the courts' resolution of either his direct appeal or his PCRA appeal.  Petitioner generally asserts in his memorandum that all claims presented have been exhausted and, specifically with regard to this claim, that "[i]n his PCRA filings . . . . Petitioner challenged not only Mr. Morris's negligence on appeal but also his failure to request (or object to the absence of) a cautionary instruction."  (Doc. No. 2 at 34.)  Though the exhaustion defense is not waived by a failure to respond, 28 U.S.C. § 2254(3), Respondents do not challenge these contentions either in their response to the petition, by responding to the Petitioner's objections to the R&R, or by way of filing their own objections to the R&R.  As such, the Court will review the claim.[4]

---

[4]  Even if the claim were unexhausted, it would not alter the Court's resolution of this petition.  It is clear that Petitioner would be unable to present the claim to the Pennsylvania courts at this time considering the applicable one year statute of limitations on PCRA petitions has passed and the limited exceptions to that limitations period would be inapplicable to this claim.  See 42 Pa. Con. Stat. Ann. § 9545(b).  Because the Court finds that Petitioner has not presented a viable ineffective assistance claim, it is clear that he could also not show prejudice to excuse a procedural default, which requires the habeas petitioner show "'not merely that the errors at trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).

**1. Ineffective Assistance**

To assess whether Petitioner's counsel was constitutionally ineffective, the Court applies the standard set out by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Under <u>Strickland</u>, "a criminal defendant may demonstrate that his representation was constitutionally inadequate by proving: (1) that his attorney's performance was deficient, i.e., unreasonable under prevailing professional standards; and (2) that he was prejudiced by the attorney's performance." <u>Booth</u>, 432 F.3d at 546 (citing <u>Forte</u>, 865 F.2d at 62). The first prong requires that the defendant identify counsel's challenged acts or omissions, <u>Strickland.</u> 466 U.S. at 690, and show that counsel's representation fell below an objective standard of reasonableness. <u>United States v. Lilly</u>, 536 F.3d 190, 196 (3d Cir. 2008) (citing <u>Strickland</u>, 466 U.S. at 688.) Judicial scrutiny is highly deferential under the first prong, and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Booth</u>, 432 F.3d at 546 (quoting <u>Strickland</u>, 466 U.S. at 688-89)). To establish prejudice for the second prong, the defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. When evaluating a claim of ineffectiveness under <u>Strickland</u>, the Court may consider the prejudice prong before examining the performance of counsel prong "because this course of action is less burdensome to defense counsel." <u>Lilly</u>, 536 F.3d at 196 (quoting <u>Booth</u>, 432 F.3d at 546)).

For purposes of this memorandum, the Court will solely examine the prejudice prong of <u>Strickland</u> and assume that counsel's failure to request an appropriate limiting instruction was

substandard performance.  Indeed, since evidence of Petitioner's drug trafficking was presented, in the prosecutor's own words, as a "fateful element" of the prosecution, it might be difficult to conceive of a proper strategic reason to neglect requesting such an instruction.  See Albrecht v. Horn, 485 F.3d 103, 127 (3d Cir. 2007) ("Trial counsel is not constitutionally required to request a limiting instruction any time one could be given, because counsel might reasonably conclude that such an instruction might inadvertently call attention to the evidence of prior bad acts.  In Albrecht's case, however, we do not believe that counsel might reasonably have concluded that it was strategically preferable to omit the request . . . the evidence of spousal abuse was not briefly or fleetingly presented.") (internal citations omitted).

Considering the entire record, the Court finds that Petitioner cannot show that there is a reasonable probability that the result of his trial would have been different had his counsel requested the limiting instruction on other bad acts evidence.  The Court agrees with Petitioner that other crimes evidence, though probative and properly admitted for another purpose, always carries a danger that the jury will draw the improper inference that Petitioner had bad character and a propensity for criminal behavior.  See e.g., Old Chief v. United States, 519 U.S. 172, 180-81 (1997).  As discussed above, the evidence of Petitioner's prior drug activity in this case was clearly probative on several proper issues in the case, but clearly, a limiting instruction would have helped to safeguard against the jury making improper inferences and limited the potential prejudice resulting from admission of the drug trafficking evidence.  See Horn 485 F.3d at 128.  Despite this, the Court must consider the strength of the evidence in assessing whether the Petitioner can demonstrate prejudice under Strickland.  Id. at 128-29 (citing Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999)).  Here, as discussed at length above, there was

significant evidence supporting the charges of conviction offered against Petitioner at the trial, which affirms the Court's confidence in the jury's discriminating verdict, acquitting Petitioner of conspiracy and first-degree murder and convicting him of kidnaping and third-degree murder. Accordingly, Petitioner cannot demonstrate that he suffered prejudice as a result of his counsel not seeking a limiting instruction and the Court will deny his claim for habeas relief on this ground.

### 2. Due Process

Petitioner has also alleged a violation of due process resulting from the absence of the appropriate limiting instruction. "Habeas relief for a due process violation concerning an absent or defective jury instruction is available only when the absence of an instruction, or a defective instruction, infects the entire trial with unfairness." Albrecht, 485 F.3d at 125 (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The Court must examine the evidence in the case and overall instructions to the jury in determining whether a constitutional violation has occurred. Id. (citing Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995)). The Supreme Court has held, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). Additionally, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Id. at 155.

Here, Petitioner's claim rests on the absence of a limiting instruction on the admitted other crimes evidence of drug trafficking and not a misstatement of the law. Further Petitioner's trial counsel did not request or object to the lack of a cautionary instruction. Considering the overall proceedings, the rest of the instructions given to the jury, and the significant evidence

against Petitioner, the Court finds that the absence of a limiting instruction did not infect the entire trial with unfairness such that it was a violation of Petitioner's due process.  <u>Albrecht</u>, 485 F.3d 129.

## III.     CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules governing § 2254 cases, at the time a final order denying a petition under 28 U.S.C. § 2254 is issued, the Court must make a determination as to whether a certificate of appealability should issue pursuant to 28 U.S.C. § 2253(c)(1)(A).   A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debateable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). Where the district court dismisses the petition based on procedural grounds,

> "a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. . . . Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further.

<u>Id.</u>

Considering the above, the Court will issue a certificate of appealability solely on two issues raised by Petitioner: (1) whether the prosecutor's conduct so infected the trial with unfairness that the resulting conviction was a denial of due process; and (2) whether defense

counsel was constitutionally ineffective for failing to request that the trial court instruct the jury on the limited purpose for the admitted "other bad acts" drug evidence. The Court finds that, given the nature of the issues and the circumstances of this case, Petitioner meets the standard required by § 2253(c) on these claims alone.

## IV.    CONCLUSION

Based on the foregoing, the Court will overrule Petitioner's objections and adopt Judge Blewitt's R&R denying Petitioner's habeas corpus petition with the additional considerations discussed above. The Court will issue a certificate of appealability on two issues raised by Petitioner: (1) whether the prosecutor's conduct so infected the trial with unfairness that the resulting conviction was a denial of due process; and (2) whether defense counsel was constitutionally ineffective for failing to request that the trial court instruct the jury on the limited purpose for the admitted "other bad acts" drug evidence.   An order consistent with this memorandum will follow.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIE GOODING,** | : | |
| | : | **Civil Action No. 1:CV-07-1243** |
| **Petitioner** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | **(Magistrate Judge Blewitt)** |
| **JAMES WYNDER et al.,** | : | |
| | : | |
| **Respondents** | : | |

<u>**ORDER**</u>

    **AND NOW**, on this 9th day of December, 2009, having reviewed Magistrate Judge

Thomas M. Blewitt's Report and Recommendation recommending that Petitioner Willie

Gooding's petition for writ of habeas corpus be denied (Doc. No. 22), and Petitioner's objections

thereto (Doc. No. 23), **IT IS HEREBY ORDERED THAT**:

    1.    Petitioner Willie Gooding's objections to the Report and Recommendation (Doc. No. 23) are **OVERRULED**;

    2.    The Report and Recommendation (Doc. No. 37) is **ADOPTED** with the additional considerations discussed in the Court's memorandum opinion filed herewith;

    3.    The petition for a writ of habeas corpus (Doc. No. 1) is **DENIED**.  The Clerk of Court is directed to close the file; and

    4.    A certificate of appealability is **ISSUED** with respect to two issues: (1) whether the prosecutor's conduct so infected the trial with unfairness that the resulting conviction was a denial of due process; and (2) whether defense counsel was constitutionally ineffective for failing to request that the trial court instruct the jury on the limited purpose for the admitted "other bad acts" drug evidence

                                     <u> S/ Yvette Kane          </u>
                                     Yvette Kane, Chief Judge
                                     United States District Court
                                     Middle District of Pennsylvania